MEMO ENDORSED

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/4/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ALLEN JONES,

                    Petitioner,

      - against -

EARL BELL, Superintendent,

                    Respondent.

------------------------------------------------------------X

20-CV-1951 (CM)(RWL)

**REPORT & RECOMMENDATION
TO HON. COLLEEN MCMAHON:
PETITION FOR HABEAS CORPUS**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
FILED: 1/26/2022

**ROBERT W. LEHRBURGER, United States Magistrate Judge**

        Allen Jones brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for, *inter alia*, first-degree manslaughter. Jones argues that (1) the State withheld *Brady* material from the defense; and (2) Jones was denied his right to confrontation when the trial court refused to strike the testimony of a critical cooperating witness who invoked his Fifth Amendment right and refused to answer numerous questions on cross-examination. (Petition at 6-8.[1]) For the reasons that follow, I recommend that Jones's petition be DENIED and the action dismissed.

**BACKGROUND**

**A.    The Crime And Arrest**

        On May 5, 2010, 18-year-old Elias Peguero was shot and killed inside the La Plaza Grocery Store (the "bodega"), located at the corner of 206th Street and 10th Avenue in

---

*1/26/2022*

*The Court has carefully reviewed the Magistrate Judge's Report and the objections thereto. Finding no merit in the objections I accept the Report and adopt it as the decision of the court and, on the recommendation of the learned Magistrate Judge,*

*I dismiss the Petition.*

[1] "Petition" refers to Jones' petition for writ of habeas corpus (Dkt. 5).

*Petitioner has made no showing of the denial of a constitutional right, no certificate of appealability shall issue. 28 USC §2253. I certify that an appeal from this order would not be taken in good faith. 28 U.S.C. §1915(a).*   *Colleen McMahon*

New York County. (Tr. 17-18.[2]) A surveillance video from a nearby gas station captured four men – Allen Jones, Nakae Thompson, Danny Barnhill, and an unidentified fourth person – walking towards the bodega, with Jones leading the group. (BP Video at 21:43:37-57.[3]) Around the same time, video surveillance from outside the bodega captured Peguero walking across the street and pausing in front of the store to look behind him as the four men approached. (Bodega Video IV at 22:39:52-40:08.[4]) Peguero looked over his shoulder again as he entered the store. (Bodega Video at 22:40:08.)

Video surveillance from inside the store captured Peguero walking into the bodega and speaking to a man wearing a white t-shirt and dark baseball cap (later identified as Yandwin Corniel, whose testimony is at the heart of this Petition). (Bodega Video VI at 22:40:16-21.) Peguero then walked back towards the entrance of the store with Corniel close behind him as Jones, followed by Thompson, entered the store. (Bodega Video II at 22:40:22; III at 22:40:28, IV at 22:40:19, IV at 22:40:22-24.) Thompson wore a blue sweatshirt with white stripes, and Jones wore a blue shirt and a blue Yankee's baseball cap. (Bodega Video IV at 22:40:21.) Thompson blocked the entrance as Jones stood to the left of Peguero. (Bodega Video VI at 22:40:26.) According to testimony from the store clerk, Arafet Saleh, who is also visible in the videos, someone said "hit him." (Tr. 150.) Jones then punched Peguero and grabbed his neck and head with both hands. (Bodega Video II at 22:40:26-33.) Peguero attempted to break free as they both struggled towards

---

[2] "Tr." refers to the transcript of Jones's criminal trial (Dkts. 16-18 at 4 through 16-38 at 38).

[3] "BP Video" refers to State Exhibit 23, on file with the court.

[4] "Bodega Video" refers to State Exhibit 103, on file with the Court. The video has several "channels." The court distinguishes between them with roman numerals.

the back of the store. (Bodega Video II at 22:40:26-33.) Corniel attempted to intercede, but Jones did not engage with him. (Bodega Video III at 22:40:28-29.)

Meanwhile, Thompson attempted to pull out a gun, dropped it on the ground, picked it back up, and ran towards the back of the store. (Bodega Video VI at 22:40:29-34). Jones tried to hold onto Peguero and looked back at Thompson who approached with a gun in his hand. (Bodega Video VI 22:40:33; Tr. 170-173).

When Peguero broke free from Jones's grip, Jones and Thompson watched as Peguero made his way around the back of the store to the left aisle. (Bodega Video VI at 22:40:33-37.) Barnhill, who wore a white hooded sweatshirt and carried a white bag full of ice, entered the store and waited at the end of left aisle by the entrance as Thompson made his way back towards the front of the store and Jones followed Peguero down the left aisle. (Bodega Video VI at 22:40:32-40.) Peguero grabbed a broom and ran down the left aisle towards Barnhill. (Bodega Video VI at 22:40:33.) Barnhill then hit Peguero in the face with the bag of ice, and Thompson shot him. (Bodega Video VI at 22:40:39-40.) At that time, Corniel was running toward the back of the store and down the basement stairs. (Bodega Video III at 22:40:40-44.)

Peguero stumbled towards the back of the store as Thompson and Barnhill ran out of the store. (Bodega Video VI at 22:40:36-42.) Jones walked out after them. (Bodega Video VI at 22:40:36-44.) Paramedics arrived shortly thereafter, and Peguero was pronounced dead at the scene. (Tr. 343.)

On May 6, 2010, Corniel was interviewed by police officers and informed them of what he had seen in the bodega, including that the man in the Yankees baseball cap

(Jones) said "pop him." (May 6, 2010 Police Report.[5]) The next day, police arrested Jones at his residence and found a blue Yankees baseball cap outside of one of his windows. (Tr. 366-70, 767-71.) Jones was placed in a lineup; the store clerk, Saleh, identified him; and he was arrested and charged with one count of murder in the second degree, N.Y. Penal Law § 125.25(1); one count of gang assault in the first-degree N.Y. Penal Law § 120.07; one count of gang assault in the second degree, N.Y. Penal Law § 120.06; and two counts of criminal possession of a weapon in the second degree, N.Y. Penal Law §§ 265.03 (1)(b) and (3). (Indictment.[6])

## B.   Pretrial Proceedings

On June 22, 2010, Jones's attorney, Daniel J. Gotlin, filed an omnibus motion, a request for a Bill Of Particulars, and a Demand To Produce. (Disc. Mot. at A. 394-423.[7]) In the motion, Mr. Gotlin demanded that the prosecution provide any exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1983), as well as any evidence that might adversely affect the credibility of any prosecution witness pursuant to *United States v. Giglio*, 405 U.S. 150, 92 S. Ct. 763 (1972). (Disc. Mot. at A. 427, 419-20.) In response to the motion, the State acknowledged its duty to disclose exculpatory material under *Brady* and maintained that Jones's indictment, felony

[5] "May 6, 2010 Police Report" refers to the police report of an interview with Corniel dated May 6, 2010 (A. 444-47). "A." refers to the Appendix of state court materials submitted to this Court by Respondent (Dkt. 13).

[6] "Indictment" refers to the indictment in *People v. Jones*, No. 2086/10 (N.Y. Sup. Ct. May 21, 2010) (A. 979-81).

[7] "Disc. Mot." refers to the omnibus motion, demand to produce, and request for bill of particulars filed by Mr. Gotlin on June 22, 2010 (A. 394-423).

complaint, and Voluntary Disclosure Form ("VDF"), all of which it had already provided, satisfied its obligations. (Disc. Mot. Resp. A. 236-27.[8])

On March 18, 2013, at a suppression hearing pursuant to *Dunaway v. State Of New York*, 442 U.S. 200, 99 S. Ct. 2248 (1979), *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961), and *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838 (1965), the State asked the court to keep redacted the names and contact information of certain witnesses, including "witness three" (later identified as Corniel). (Huntley Hearing Tr. 7-8. [9]) Jones objected, but the court ruled that the State gave good cause for sealing the witnesses' names and authorized the protective order. (Huntley Hearing Tr. 7-8.)

On June 24, 2013, prior to jury selection, the court kept the protective order in place, but the State agreed to turn over a list of criminal convictions of the protected witnesses. (Pretrial Proceeding Tr. 15, 61-62.[10]) The list revealed extensive prior contact with law enforcement for "witness three" (Corniel). On June 30, 2011, Corniel was adjudicated as a youthful offender for petit larceny. He had a February 1, 2012 conviction for possession of a weapon in the fourth degree and disorderly conduct and a July 31, 2012 conviction for possession of marijuana. He also had three pending cases: one for a July 26, 2012 arrest for possession of marijuana; one for an August 14, 2012 arrest for reckless driving and endangerment; and one for possession of a weapon and ammunition

---

[8] "Disc. Mot. Resp." refers to the Affirmation In Response to the Defendant's Omnibus Motion, dated August, 20, 2010 (A. 425-33).

[9] "Huntley Hearing Tr." refers to the transcript of the *Dunaway*, *Mapp*, *Huntley* hearing held on March 18, 2013 (Dkt. 13-13 at 455-456).

[10] "Pretrial Proceeding Tr." refers to the transcript of the pretrial proceedings and voir dire held on June 24, 26, and 27, 2013 (Dkts. 16-10 through 16-15).

(the "open gun case").  All of that was disclosed to defense counsel before trial. (Disclosure List, A. 476.)

On February 1, 2011, the court granted the State's motion to consolidate the cases against Jones, Thompson, and Barnhill, but Barnhill was later severed, and the trial proceeded with Thompson and Jones as co-defendants.  (Order to Consolidate at 1.[11]) On June 27, 2013, during jury selection, Thompson's attorney, Thomas Klein, told Jones's attorney, Mr. Gotlin, that he had discovered that the State's "witness three" was Corniel and subsequently provided Mr. Gotlin with information about Corniel, including a felony complaint and VDF related to the open gun case.  (Pretrial Proceeding Tr. 283-85.)

The complaint for the open gun case, filed by Assistant District Attorney Fionnuala O'Doherty ("ADA O'Doherty"), included the following:

> Deponent recovered from the draw[er] in the defendant's bedroom a loaded 9mm pistol, ammunition for a 9mm and 380 caliber ammunition.  Deponent also recovered from the defendant's bedroom a bullet proof vest and marijuana.
>
> Deponent is informed by the defendant that the gun and vest are his and that he has had the gun for over 3 years because he is in the business of selling fake drugs and needs the gun because he has problems in the streets.

(Corniel Complaint at 1.[12])

The VDF revealed that Corniel had made a statement to ADA O'Doherty related to his open gun case and included the following:

> Defendant admitted that the gun was his.  He stated he had a problem on the street and needed the guns and a vest.  He

---

[11] "Order to Consolidate" refers to court's order granting the State's motion to consolidate the Jones, Barnhill, and Thompson indictments pursuant to § 200.20(1)(c) (Dkt. 16-2 at 4).  The order severing Barnhill is absent from the record.

[12] "Corniel Complaint" refers to the indictment and supporting documents for Corniel's September 6, 2012 weapons possession charge (A. 486-89).

> admitted that he had a second gun, but sold it.  He admitted
> he had worn vest and guns out on the street due to the
> problem.  He said that he had the one gun for a long time as
> he sold fake drugs and that due to the dangers of the drug
> trade he need[s] the gun.

(VDF at 2.[13])  Although not disclosed by the state, all of that information about Corniel

thus was also available to defense counsel before trial.

## C.    Trial

At the jury trial of Jones and Thompson, which commenced on or about June 24,

2013, the State's case consisted of seventeen witnesses, including two eyewitnesses;

two video recordings; a redacted recording of a call made by Jones while incarcerated at

Rikers Island; and five stipulations, including one related to Corniel.  (Tr. 41-830.)

The jury saw the videos and heard the testimony about the incident and

subsequent investigation outlined above.  (*See* Tr. 42-60,110-744, 767-71.)  Most

importantly for the instant Petition, the State called Corniel as a witness to testify about

the shooting.  Since what Corniel did and did not testify about are critical to Jones's

Confrontation Clause claim, the Court reviews his testimony in some detail.

On direct, after asserting his Fifth Amendment privilege and then being granted

immunity as to each question, Corniel testified that he was friends with Peguero and was

at the bodega on the day of the incident.  (Tr. 383-84, 426.)  After reviewing the videos,

Corniel noted that he and a friend were in the Bodega when Peguero entered.  (Tr. 397-

400.)  Jones, "the guy [Corniel and Peguero] had the conflict with," entered the store

wearing a Yankees baseball cap, along with Thompson, who was wearing a blue-and-

white striped shirt, and a fist fight ensued, with Jones throwing the first punch.  (Tr. 400-

---

[13] "VDF" refers to the State's VDF in the case against Corniel, dated September 5, 2012 (A. 490-494).

08.)  At the end of the conflict, Corniel testified, he heard Jones say "pop him," and then, one to three second later, Thompson fired the shot.  (Tr. 408-12, 424.)  Corniel further testified that he was in the back of the store by the ice machine, running away, and Jones was behind him, when he heard the words "pop him."[14]  By the time he heard the shot, he was already walking down to the basement door, where he fled after hearing the shot. (Tr. 413-18, 423, 425.)

On cross, defense counsel asked what Jones did for a living; Corniel refused to answer; the prosecution did not request immunity; and defense counsel moved for a mistrial.  (Tr. 427.)  The prosecution explained that it would request immunity with respect to the same subject matters asked on direct.  (Tr. 428.)  Nevertheless, defense counsel asked, and Corniel refused to answer, questions about whether he ever had a nine-to-five job, whether he worked in the drug business, and whether Peguero worked in the drug business with him.  (Tr. 432-33.)

The prosecution did confer immunity about, and Corniel was impeached on, the issue of who said, "pop him."  After Corniel confirmed he believed that it was Jones who said, "pop him," defense counsel read back his grand jury minutes, where he had said that Barnhill had said, "[y]oo, look at them right there.  Come pop him.  Pop him, Boom." (Tr. 435-49.)  Corniel confirmed that that was his testimony before the grand jury and that it was truthful.  (Tr. 450.)

---

[14] Corniel's testimony is quite inconsistent as to whether the ice machine was in the front or back of the store, thus making it difficult to know whether he believed he was in the front or back of the store at various points.  Either way, as discussed below, he contradicted himself as to whether he was in the front or back of the store during the critical moments when someone allegedly said, "pop him" and Peguero was shot.

At that point, lunch recess was taken.  During the lunch recess, the ADAs spoke with Corniel and told him that they would make the extent of his cooperation in Jones's case known to the sentencing judge in his open gun case.  (Tr. 586-87.)

When the proceedings continued, defense counsel knew about the cooperation agreement.  (*See* Tr. 586-87.)  Still on cross, Corniel refused to answer questions about whether he had ever sold drugs, sold fake drugs, carried a gun, bought baggies at the bodega to sell drugs, or stole something in 2011.  (Tr. 500-03, 536-37, 559, 562-63, 573.)  Defense counsel asked, but Corniel refused to answer, questions about his open gun charge, including if he had an open gun charge; if police had searched his home and found a gun, ammunition, and a bulletproof vest; if he confessed to needing the gun and vest due to being in the business of selling fake drugs; if he had worn the gun and vest onto the street; and if he had had a second gun but sold it.  (Tr. 584-85, 595-99, 604-05.)

Corniel received immunity, and answered questions about, being in possession of marijuana in the area of the bodega on April 27, 2012 and driving a motorcycle without a license, which he knew was illegal, on August 14, 2012.  (Tr. 573-79.)  Corniel also received immunity, and answered questions about, what he was doing approximately one hour prior to the incident.  (Tr. 507.)  He testified that he had been hanging out and smoking marijuana outside the bodega with the friend he was with in the bodega video; that he had smoked an entire marijuana cigarette on his own; and that, at the time of the incident, he was high from smoking the marijuana cigarette.  (Tr. 513-19, 528-30.)  He also testified that he had spent the whole day hanging out in the area of the bodega but smoked only one joint that day.  (Tr. 529-30.)

The prosecution also conferred immunity, and Corniel testified about, the incidents that unfolded in the bodega, including who struck whom and Corniel's role in the altercation. (542-49.) The defense further impeached Corniel on the issue of who said, "pop him." Defense counsel asked, "You don't know which individual said anything; is that right?" and Corniel answered, "That's right." (Tr. 553-54.)

Regarding his cooperation agreement, Corniel was granted immunity on the issue of, and testified that, he had met with the ADAs the previous day at lunch but refused to answer questions about the conversation, including whether he was promised anything for his testimony. (Tr. 587-86, 595, 600.)

On re-direct and re-cross, the prosecution and defense went back and forth on the issue of whether Corniel heard Jones say, "pop him." To the prosecution, Corniel said he was in the front of the store by the ice machine and Jones was passing him when he heard Jones say the words. (Tr. 610-13.) To the defense, Corniel again confirmed that he was headed to the back of the store. (Tr. 624-25.) To the prosecution, he again said he was in the front of the store and Jones said the words. (Tr. 628-37.) To the defense, Corniel said that he was in the back of the store, and the shooter was in the front, when he heard the words. (639-41.) After Corniel's testimony, defense counsel again moved for a mistrial. (Tr. 646-47.)

At the end of live testimony, counsel and the court discussed a number of stipulations, including one about Corniel's informal cooperation agreement. Defense counsel made it clear that they still believed that not being able to cross Corniel on the agreement was a Confrontation Clause violation but were effectively making the best of a bad situation by agreeing to the stipulation. (Tr. 850.)

The following stipulation about the cooperation agreement was read to the jury:

1) Yandwin Corniel was arrested on August 16, 2012 and was charged with Criminal Possession of a Weapon in the Second Degree, P.L. § 265.03.(1)(b) and Unlawful Possession of Ammunition, AC § 10-131(i)(3). The case is currently pending in New York County Supreme Court. The facts of that case are as follows: (i) on August 16, 2012, police officers executed a search warrant in the apartment where Mr. Corniel resides, (ii) the police officers found a loaded 9mm firearm and ammunition for a 9mm firearm and ammunition for a .380 caliber firearm inside of a dresser drawer, (iii) the police recovered a bullet proof vest from under the mattress of a bed Mr. Corniel was sleeping in, and (iv) Mr. Corniel made a statement to a detective and an Assistant District Attorney where he stated that he had the gun for over three years because he is in the business of selling fake drugs and needs the gun because he has problems on the street. He also said that he had a .380 gun but sold it. Mr. Corniel is facing up to 15 years in prison if convicted of this charge.

2) Mr. Corniel was arrested on July 4, 2012 and was charged with Criminal Possession of Marijuana, P.L. § 221.10 for holding marijuana in public. The case is currently pending in New York County Criminal Court.

3) During the lunch break on July 10, 2013, Assistant District Attorneys Janine Gilbert, Alyssa Gunther, and William Mahoney met with Mr. Corniel and his attorney Richard Giampa at the New York County District Attorney's Office. The Assistant District Attorneys stated that the District Attorney's Office will make the nature and extent of Mr. Corniel's cooperation in this case known to the court on his open case where he is charged with Criminal Possession of a Weapon in the Second Degree and Unlawful Possession of Ammunition should he face sentencing on that case. The Assistant District Attorneys also agreed that upon Mr. Corniel's request the District Attorney's Office would inform the sentencing court of any fact we know to be true with

11

Case 1:20-cv-01951-CM-RWL   Document 25   Filed 01/26/22   Page 12 of 57

> respect to this case on trial as well as the defendants in this
> case, should Mr. Corniel face sentencing on his open matter.

(Tr. 860-61; Stipulation 1-2.[15])

In closing, defense counsel discussed Corniel, arguing that Corniel was not a credible witness and had not heard Jones say "pop him"; urging the jury to consider the "deal" Corniel had made with the prosecution in assessing his credibility; and noting that Corniel was a drug dealer, sold fake drugs, used drugs, and had guns. (Tr. 912-29.)

The State dedicated a section of its closing argument to the evidence establishing Jones's intent to either kill or cause serious physical injury. It started with a review of the videos, noting that Jones led the group as the men approached the bodega; was the first one in the store; was the first to punch Peguero, stunning him for the subsequent assault; tried to hold Peguero as Thompson pulled out the gun; was the only person hitting, choking, and holding Peguero; did not act surprised when he saw the gun; and, after Peguero broke free, continued to pursue Peguero despite having seen the gun, leading to Peguero being trapped and shot. (Tr. 1015-19.) The prosecution then noted that, "if his actions didn't speak loud enough about his intent," Jones said "pop him" and the shot was fired. (Tr. 1019-20.) The prosecution then returned to the video and emphasized that Jones showed no shock at Peguero being shot, even compared to the other perpetrators. (Tr. 1021-25.)

During the jury charge, the judge informed the jury that it could consider Corniel's "refusal to answer [incriminating] questions in determining the believability and weight of his testimony." (Tr. 1077.)

---

[15] "Stipulation" refers to the Stipulation entered by the People in the trial at which Jones was convicted (A. 694-95).

12

On July 22, 2013, the jury acquitted Jones of second-degree murder but convicted him of first-degree manslaughter, N.Y. Penal Law § 125.20(1), and first-degree gang assault, N.Y. Penal Law § 120.07.  On May 15, 2014, Jones was sentenced to eighteen years in prison plus five years post-release supervision.  (Sentencing Tr. 26.[16])

**D.   Post-Conviction Revelations About Corniel**

After Jones was convicted, the prosecution of Corniel's open gun case went forward.   Ever since, Jones has argued that information revealed during the trial constitutes information that should have been disclosed to him before his trial but was not, in violation of *Brady* and its progeny.  Specifically, the information identified by Jones was contained in (1) a written confession signed by Corniel and witnessed by his attorney; (2) ADA O'Doherty's notes of Jones's confession; (3) the transcript of ADA O'Doherty's testimony at a suppression hearing; and (4) the transcript of Corniel's sentencing.  (*See* Corniel Confession; O'Doherty Notes; O'Doherty Suppression Tr.; Corniel Sentencing Tr.[17])

Corniel's written confession read, in its entirety:

---

[16] "Sentencing Tr." refers to the transcript of Jones's sentencing (Dkt. 16-38 at 13-38).

[17] "Corniel Confession" refers to Corniel's written confession in the open gun case (A. 974-75).   "O'Doherty Notes" refers to the notes taken by ADA O'Doherty during her interview with Corniel on August 16, 2012 (A. 977).  "O'Doherty Suppression Tr." refers to the transcript of ADA Doherty's testimony at the October 8, 2013 Huntley Hearing in Corniel's criminal case (A. 724-841).  "Corniel Sentencing Tr." refers to the October 10, 2014 transcript of Corniel's sentencing (A. 912-67).

> The gun in the bedroom is mine. It is not my mom's, not my girlfriend's, not my brother's or the guy who was renting the room.
>
> I had the gun + vest because I have a problem on the street and I sell knock-o-knock (fake drugs.)

(Corniel Confession at 2.) The confession was signed by Corniel and witnessed by his

attorney, Mr. Feinman.

ADA O'Doherty's notes from taking that confession read, in their entirety,

> Yandwin said he had a hard life. He can't read or write. His goal is to sell 4 kilos to make enough money to buy an apartment in the Dominican Republic for $75,000 and a bodega in Manhattan and retire. He was worried about his mother who is in bad health. He stated he had a problem with Manso from Raylins spot. Said he beat up Manso. He said that Raylin is not letting the guys from 211th Street walk down his block. He said he confronted Raylin about this. He said that he heard Raylin shot up his block on 211th Street. He says that he works for Lefty on 205th Street, but 205th Street is too hot since his boy was killed in the bodega on 10th Avenue. He says that he is in the knock-o-knock business. He has been stabbed 3 times and showed us one stab wound on stomach. He states that Lefty has robbed over 600 people. He stated that he only robbed people in the drug business. They should not be in drug trade, so he does not feel bad about robbing them. He had a .380 due to his problem with Flac, but he sold it to some black guy and it is in PA now. He got the vest on the street and that Flac was impressed that he wore it. He said he knew Reggie, Leandro, Flac, Future, Yasmile and others. He did not know any drugs or guns, because if he knew of it he would have hit it himself. He said he did not want to speak about his friends. He said Coolos is big and Flac is making money.

(O'Doherty Notes.)

At the suppression hearing, ADA O'Doherty confirmed much of the information

above and also testified that Corniel's youthful offender adjudication was for selling a fake

gun (which was actually a bag of potatoes) to an undercover officer (O'Doherty

Suppression Tr. 14); that when he beat up Manso, he had pistol-whipped him (O'Doherty

Suppression Tr. 31); that when he confronted Raylin, he did so armed with his bulletproof vest and both guns (O'Doherty Suppression Tr. 31); and that she had chosen not to charge him for the incident (O'Doherty Suppression Tr. 87-90).

The transcript of Corniel's sentencing revealed that his 2014 disorderly conduct conviction stemmed from possessing a pen knife on the street that he attempted to discard as police approached him and that he had prior marijuana cases.  (Corniel Sentencing Tr. 29.)  With respect to his open gun case, the transcript revealed that, in addition to recovering the gun, bulletproof vest, and ammunition, the police had recovered a sword, calculator, marijuana, fifteen cellphones, white powder packaged like cocaine, and pet bedding packaged like marijuana (Corniel Sentencing Tr. 24, 29, 51), and that the State had learned that the gun had previously been fired and the bulletproof vest had been stolen from law enforcement.  (Corniel Sentencing Tr. 27.)

## E.    Appeals

On April 26, 2016, Jones filed a § 440 post-conviction motion in the Supreme Court of the State of New York to vacate his conviction due to *Brady* violations based on the information discovered from Corniel's prosecution on the open gun case. (§ 440 Motion & Aff.[18])  Separately, on April 30, 2018, Jones directly appealed his conviction to the New York Appellate Division, First Department, alleging a Confrontation Clause violation, legally insufficient evidence, and an excessive sentence.  (App. Div. Mem. at 2-3.[19])

---

[18] A § 440 motion is a motion of the defendant to vacate judgment.  "§ 440 Motion & Aff." refers to Jones's motion and supporting affidavit filed in New York state court on April 26, 2016 (A. 1-21).

[19] "App. Div. Mem." refers to Jones's brief to the Appellate Division, First Apartment, directly appealing his conviction (A. 276-318).

### 1.    Collateral Attack

In Jones's § 440 motion, he argued that the following information revealed during the prosecution of Corniel's open gun case was not previously known to defense counsel, could have been used to impeach Corniel and show that he was biased, and was material under *Brady* because of the centrality of Corniel's testimony to the State's case:

(1)    That, in addition to the gun, bulletproof vest, marijuana, and cocaine, the search of Jones's home uncovered fake marijuana, fifteen cellphones, and a sword.

(2)    That Corniel had pistol-whipped someone, confronted someone with two guns and a bullet-proof vest, confessed to participating in numerous robberies, associated with someone who had committed 600 robberies, lacked remorse about it, and bragged about how he had stolen enough money to retire.

(3)    That the recovered gun had previously been fired and the bulletproof vest had been stolen.

(4)    That Corniel's youthful offender adjudication was for selling a fake gun to an undercover officer.

(5)    And that the State had decided not to charge him for his prior criminal conduct, including the robberies and pistol-whipping.

(§ 440 Mem. at 1-2; 4 § 440 Reply at 8-9, 11.[20])

The court found that Jones's submissions raised sufficient questions of fact to hold a hearing.  (Decision Ordering Hearing, A. 88-92.)  At the hearing, Jones called one witness, trial counsel Gotlin, who testified to the course of events leading to the disclosure

---

[20] "§ 440 Mem." refers to Jones's Memorandum Of Law in support of his § 440 motion (A. 22-38). "§ 440 Reply" refers to Jones's reply brief in support of his § 440 motion (A. 69-87).

and discovery of the *Brady* and impeachment materials before, during, and after Jones's trial, as outlined above.  (§ 440 Tr. 17-43.[21])

After the hearing, the court denied Jones's motion to vacate his conviction.  (§ 440 Decision at 2.[22])  The court found that some impeachment evidence had been suppressed but concluded that it was not material under *Brady*.  Under *Brady*, suppressed evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  Under the federal Constitution, that standard applies whether the evidence was specifically applied or not.  *Id.*, 105 S. Ct. at 3383.  In contrast, under the New York Constitution, if the evidence was specifically requested, due process is violated where there is a "reasonable possibility" that its disclosure would have affected the outcome of the proceedings, which is an easier burden for defendants to satisfy.  *People v. Vilardi*, 76 N.Y.2d 67, 77, 556 N.Y.S.2d 518, 523 (1990).

Over the State's objections, the § 440 court applied the standard that was more favorable to Jones and still found that the undisclosed evidence was not material.  (§ 440 Decision at 17.)  With respect to the additional items discovered during the search of Corniel's home, the Court found that there was no reasonable possibility that the proceedings would have been different because of the disclosure of that information, and thus it was not material under *Brady*.  (§ 440 Decision at 18.)

---

[21] "§ 440 Tr." refers to the transcript of the § 440 Hearing held on July 18, 2017 before the New York Supreme Court (A. 93-216).

[22] "§ 440 Decision" refers to the New York Supreme Court's October 24, 2017 decision and order on Jones's § 440 motion (A. 218-43).

The court noted that disclosure of information about the pistol-whippings and robberies would not have contradicted anything Corniel testified to at trial or tend to show that Jones was misidentified. (§ 440 Decision at 20-21.)  Jones argued that Corniel was a critical witness because he was the only one who testified that Jones said, "pop him," but the Court found that Jones effectively impeached Corniel about that testimony. (§ 440 Decision at 21.)  Jones also argued that evidence of deceitful conduct and lack of remorse was germane to Corniel's credibility, but the court found that the lack of information about Corniel's additional misdeeds had not prevented defense counsel from portraying him as untrustworthy, criminal, and manipulative during trial. (§ 440 Decision at 22.)

With respect to the facts that Corniel's gun had previously been fired and the bulletproof vest was stolen from a Corrections Officer, the court found that information "purely cumulative" of evidence already undermining Corniel's credibility, such as the Stipulation. (§ 440 Decision at 22.)  The court also noted that Corniel would have had the right to invoke – and almost certainly would have invoked – his Fifth Amendment right in response to any question about his open gun case or past criminal behavior.  (§ 440 Decision at 23-24.)

Finally, with respect to Corniel's youthful offender adjudication, the court noted that, as a matter of law, the underlying acts of a youthful offender adjudication do not constitute *Brady* material.  (§ 440 Decision at 26.)  The court did not address ADA O'Doherty's decision not to charge Corniel with any of the additional conduct to which he confessed.

Jones filed leave to appeal the § 440 Decision to the Appellate Division, which was denied on December 19, 2017.  (Denial Of Leave To Appeal, A. 244.)

18

## 2.    Direct Appeal

On direct appeal, Jones asserted the following claims: (1) he was denied his right to confrontation when the key witness against him, Corniel, invoked his Fifth Amendment right during cross-examination; (2) the evidence against him was legally insufficient and led to a verdict against the weight of the evidence; and (3) his eighteen-year sentence was excessive.  (App. Div. Br. at 2-3[23])  The Appellate Division unanimously affirmed Jones' conviction. *People v. Jones*, 167 A.D.3d 477, 87 N.Y.S.3d 884 (1st Dep't 2018).

In its decision, the Appellate Division explained that, "[b]y itself, a surveillance videotape depicting defendant's continuing aggressive conduct toward the victim was enough to warrant the conclusion that defendant shared his companions' intent to at least cause the victim serious physical injury (see Penal Law § 20.00).  The jury's mixed verdict does not warrant a different conclusion." *Id.* At 478, 87 N.Y.S.3d at 884.

With respect to Jones's Confrontation Clause claim, the court noted that Jones's arguments were similar to arguments the Appellate Division had already rejected in Thompson's appeal. *Id.*, 87 N.Y.S.3d at 884.  In that case, the Appellate Division had found that:

> Defendant received a full opportunity to cross-examine the witness about all matters related to the homicide he observed. Although the witness, on advice of counsel, declined to answer questions about his cooperation agreement, which pertained to unrelated criminal charges, there was no prejudice to defendant because the terms of the agreement, the underlying facts of the pending charges and the witness's expectation of a benefit for his testimony were revealed to the jury in detail, by way of a stipulation.  Thus, the jury was fully able to evaluate the effect of the expected benefit.  By way of contrast, questions regarding the witness's pending charges and his other criminal or possibly criminal activity were

---

[23] "App. Div. Br." refers to Jones' April 30, 2018 brief to the New York Supreme Court, Appellate Division, First Department (A. 276-319).

> collateral matters that only went to his general credibility.
> Moreover, the court instructed the jury that it could consider
> the witness's refusal to answer such questions in evaluating
> the believability and weight of his testimony.   Striking a
> witness's testimony is the most drastic relief available when a
> witness refuses further cross-examination under a claim of
> self-incrimination, and a court should only invoke it when there
> are no less drastic alternatives.

*People v Thompson*, 153 A.D.3d 433, 433-34, 59 N.Y.S.3d 378, 380 (1st Dep't 2017)

(internal quotation marks and citations omitted).

In Jones's case, the Appellate Division observed that Corniel's testimony was "more damaging" to Jones than to Thompson but concluded that "the excluded matters were still collateral, and defendant still had a full opportunity to impeach the witness and cross-examine him on all matters related to the shooting." *Jones*, 167 A.D.3d at 478, 87 N.Y.S.3d at 884.

Jones sought leave to appeal to the Court Of Appeals, raising his Confrontation Clause claim in addition to the other issues raised on direct appeal.  Jones's application for leave to appeal was denied on February 8, 2019. *People v. Jones*, 32 N.Y.3d 1205, 99 N.Y.S.3d 202 (2018).  Jones did not file a petition for a writ of certiorari with the United States Supreme Court.  (Petition at 4.)  He filed the present petition on March 5, 2020. (*See* Dkts. 1, 5.)  On April 20, 2020, the Honorable Judge Colleen McMahon referred the case to the undersigned for a Report And Recommendation.  (Dkt. 6.)

### STANDARD OF REVIEW

The Antiterrorism And Effective Death Penalty Act Of 1996 ("AEDPA") limits a federal court's ability to provide habeas corpus relief.  28 U.S.C. § 2254(a).  Under AEDPA, a state prisoner's application for a writ of habeas corpus "shall not be granted

with respect to any claim that was adjudicated on the merits in state court proceedings

unless the adjudication of the claim" either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims' and to give appropriate deference to that decision.

*Wilson v. Sellers*, __ U.S. __, __, 138 S. Ct. 1188, 1191-92 (2018) (citations omitted)

(quoting *Hittson v. Chatman*, 576 U.S. 1028, 1028, 135 S. Ct. 2126, 2126 (2015)

(Ginsburg, J., concurring in denial of certiorari)).

A state court decision is "contrary to" clearly established precedent when the state

court applies a rule that is "diametrically different, opposite in character, or mutually

opposed" to the governing law set forth in Supreme Court cases. *Williams v. Taylor*, 529

U.S. 362, 406, 120 S. Ct. 1495, 1519 (2000) (internal quotations marks omitted) (quoting

*Contrary*, Webster's Third New International Dictionary (1976)). Additionally, a "court may

grant relief under the 'unreasonable application' clause if the state court correctly

identifies the governing legal principle … but unreasonably applies it to the facts of the

particular case." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002) (citing

*Williams*, 529 U.S. at 407-08, 120 S. Ct. at 1520). This inquiry focuses not on whether

the state court's application of clearly established federal law was merely incorrect or

erroneous but on whether it was objectively unreasonable. *See id.* "Under § 2254(d), a habeas court must determine what arguments or theories supported, or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S. Ct. 770, 786 (2011).

AEDPA forecloses "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 38, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 779, 130 S. Ct. 1855, 1866 (2010)). "A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion." *Pine v. Superintendent, Green Haven Correctional Facility*, 103 F. Supp.3d 263, 275 (N.D.N.Y. 2015) (citing *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010)). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007).

Even if a trial-court error meets the standards required by AEDPA, habeas relief is not warranted unless the violation "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121, 127 S. Ct. 2321, 2327 (2007) (confirming continued applicability of *Brecht* under AEDPA); *Bentley v. Scully*, 41

F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict") (quoting *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1721)); *Butler v. Graham*, No. 07-CV-6586, 2008 WL 2388740, *6 (S.D.N.Y. June 12, 2008) (recognizing and applying "substantial and injurious effect" standard and citing *Brecht* and *Fry*).

The petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997). The petitioner also bears "the burden of rebutting the presumption of correctness" of state court fact determinations "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

AEDPA also imposes a number of threshold requirements on habeas petitioners, including that petitioners first exhaust their claims in state court. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999); *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005). The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971)); see *Galdamez*, 394 F.3d at 72-73 ("Comity concerns lie at the core of the exhaustion requirement"). The Second Circuit has adopted the Supreme Court's warning against "interpreting this [exhaustion] provision too narrowly"; exhaustion requires "'only that state prisoners give state courts a fair opportunity to act on their claims.'" *Galdamez*, 394 F.3d at 72 (quoting *O'Sullivan*, 526 U.S. at 844, 119 S. Ct. at 1728).

As a result, a petitioner need not invoke every possible avenue of state court review, but instead must "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.'" *Id.* at 73. (quoting *O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1728). Generally, a "complete round" requires presenting the federal claim to the highest court of the state, which in this case is the New York Court Of Appeals. *See id.* at 74 (citing *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000)). In the context of § 440 collateral attack, however, denial of leave to appeal to the Appellate Division constitutes a complete round. *Klein v. Harris*, 667 F.2d 274, 283–84 (2d Cir. 1981) (petitioner adequately exhausted claim collaterally attacking conviction through § 440 motion by filing unsuccessful leave to appeal to Appellate Division); *Ramos v. Walker*, 88 F. Supp.2d 233, 235 (S.D.N.Y. 2000) (same).

Furthermore, a petitioner must have "fairly presented his claims to the state courts" such that the state court had a fair opportunity to act *O'Sullivan*, 526 U.S. at 848, 119 S. Ct. at 1734. Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).

A claim that has not been fairly presented in state court is procedurally defaulted and is precluded from federal habeas review, unless petitioner can show cause for the default, and prejudice would result from the alleged violation of federal law, or that a fundamental miscarriage of justice will occur if the claim is not considered. *See Coleman v. Thompson,* 501 U.S. 722, 749-50, 111 S. Ct. 2546, 2564-65 (1991); *see also*

*Galdamez*, 394 F.3d at 73-74.  Cause for a procedural default ordinarily turns on whether the petitioner can show that "some objective factor external to the defense impeded [petitioner's] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986); accord *Coleman*, 501 U.S. at 753, 111 S. Ct. at 2566.

Where a state appellate court summarily affirms a decision by the lower court, the federal habeas court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume[s] that the unexplained decision adopted the same reasoning." *Wilson*, __ U.S. at __, 138 S. Ct. at 1192.  That presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*, S. Ct. at 1192.

## DISCUSSION

Jones argues that habeas relief is warranted because (1) the State violated its disclosure obligations under *Brady* by suppressing evidence of Corniel's criminality and motivation to lie; and (2) Jones's right to confrontation was violated when the trial court failed to strike Corniel's testimony after he refused to answer questions on cross examination.  (Pet. Mem. at 2.)  The Court first addresses whether either claim is unexhausted or procedurally defaulted and then addresses each claim on its merits.

### A.   Jones Properly Exhausted His Claims

Jones fully exhausted both claims.  His Confrontation Clause claim was exhausted when the Court Of Appeals denied him leave to appeal.  *See Galdamez*, 394 F.3d at 74 (unsuccessful application for leave to appeal to the Court Of Appeals fully exhausts claim

properly raised on direct appeal).  Jones exhausted his *Brady* claim when the Appellate

Division denied his leave to appeal the § 440 decision.  *Klein*, 667 F.2d at 283-84

(unsuccessful application for leave to appeal to the Appellate Division fully exhausts claim

properly raised in § 440 collateral attack); *Ramos*, 88 F. Supp.2d at 235 (same).

The State suggests that Jones failed to exhaust his *Brady* claim in one respect.

Specifically, the State asserts that Jones did not argue before the § 440 court that the

State had failed to disclose its decision not to charge Corniel for crimes to which he had

confessed, such as robbing drug dealers and pistol-whipping a rival.  (Resp. Mem. at

37.[24])

The State is mistaken.  Although the § 440 court did not address the point, Jones

squarely argued in his second brief to the § 440 court that the undisclosed decision not

to charge Corniel with the additional crimes to which Corniel had confessed was a *Brady*

violation:

> [T]he scope of the benefit that Corniel received for
> cooperating was suppressed.  While the defense learned that
> the prosecution would inform Corniel's sentencing judge of his
> cooperation in this prosecution, the defense never knew that
> the prosecution had decided not to charge Corniel with the
> hundred of robberies and the gun-point assault.
>
> . . .
>
> Corniel had every reason to curry favor with the prosecution
> here not merely because (as the prosecution disclosed) his
> cooperation would become known to his sentencing judge but
> more significantly (as the prosecution suppressed) because
> his cooperation ensured that he would not be charged with the

---

[24] "Resp. Mem." refers to the Respondent's Memorandum In Opposition To Petition For
A Writ Of Habeas Corpus (Dkt. 13-1).

> hundreds of gun-point robberies and the brutal pistol-whipping
> assault.[25]

((§ 440 Reply at 8-9, 11.) Jones raised the argument again in his request for leave to appeal to the Appellate Division. (§ 440 Appeal at 9, 16.[26])

Accordingly, the entirety of Jones's *Brady* claim was exhausted and is properly before the Court. *Klein*, 667 F.2d at 283-84; *Ramos*, 88 F. Supp.2d 233, 235.

## B.    The *Brady* Claim

Jones makes two arguments with respect to his *Brady* claims. First, he argues that the § 440 court applied the incorrect standard in deciding whether the undisclosed evidence was material under *Brady* and its progeny. (Pet. Mem. at 27-28.) Second, he argues that, even if the § 440 court applied the correct standard under *Brady*, the § 440 court unreasonably applied clearly established federal, constitutional precedent in concluding that the evidence was not material. (Pet. Mem. at 27-28.) Jones is incorrect on both counts.

### 1.    Relevant Law

The Supreme Court has held that the suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97; *see Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383. There are three elements to a *Brady* violation. *See Strickler v. Greene*, 527 U.S. 263, 281-82,

---

[25] The State does not argue that raising the issue in a reply brief in support of a § 440 motion, rather than in an opening brief, renders a claim unexhausted. That is understandable inasmuch as the § 440 court was in receipt of the reply brief before granting a hearing on the motion, holding the § 440 hearing, and rendering a decision, and thus had a full opportunity to consider the claim.

[26] "§ 440 Appeal" refers to Jones's application for leave to appeal (A. 244-62).

119 S. Ct. 1936, 1948 (1999). First, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. *See Bagley*, 473 U.S. at 676, 105 S. Ct. at 3380; *see also Giglio*, 405 U.S. at 154, 92 S. Ct. at 766. Second, the evidence must have been suppressed by the State, either willfully or inadvertently. *See United States v. Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 2400-01 (1976). Third, the evidence must be "material," meaning that prejudice resulted from the failure to disclose the evidence. *See Bagley*, 473 U.S. at 678, 105 S. Ct. at 3381.

"Evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different, such that the failure to disclose undermines confidence in the verdict." *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 91 (2d Cir. 2014) (internal quotation marks and brackets omitted) (quoting *Cone*, 556 U.S. 449, 469-70, 129 S. Ct. 1769, 1782-83 (2009)); *accord Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383 (evidence is material under *Brady* where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995) (the main inquiry "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence").

The materiality inquiry is thus a retrospective one:

> "[a]lthough the government's obligations under *Brady* may be thought of as a constitutional duty arising before or during the trial of a defendant, the scope of the government's constitutional duty is ultimately defined retrospectively, by

28

> reference to the likely effect that the suppression of particular
> evidence had on the outcome of the trial."

*Certified Environmental*, 753 F.3d at 91 (quoting *United States v. Coppa*, 267 F.3d 132,

140 (2d Cir. 2001)).  In that respect, the *Brady* materiality standard imposes a higher

burden on the defendant than the customary harmless-error standard, such that once a

reviewing court has found constitutional error under *Brady*, there is no need for further

harmless error review.  *Kyles*, 514 U.S. at 435-36, 115 S. Ct. at 1566-67.

To determine whether there is a reasonable probability that the suppressed

evidence would have changed the outcome of the proceeding, a reviewing court must

analyze the cumulative effect of all the suppressed evidence favorable to the defense.

*Kyles*, 514 U.S. at 437-38, 115 S. Ct. at 1565-66.  But the court must also evaluate the

withheld evidence in the context of the entire record, *id.*, and where the evidence against

the defendant was ample or overwhelming, the withheld evidence is less likely to be

material than if the evidence of guilt was thin.  *See United States v. Gil*, 297 F. 3d 93, 103

(2nd Cir. 2002); *see also Smith v. Cain*, 565 U.S. 73, 76, 132 S. Ct. 627, 630 ("evidence

impeaching an eyewitness may not be material if the State's other evidence is strong

enough to sustain confidence in the verdict").

Where undisclosed evidence may have been "possibly useful to the defense," but

was "not likely to have changed the verdict," it is not material under *Brady*.  *Giglio,* 405

U.S. at 154, 92 S. Ct. at 766; *see also Agurs*, 427 U.S. at 109-110, 96 S. Ct. at 2400

("[t]he mere possibility that an item of undisclosed information might have helped the

defense, or might have affected the outcome of the trial, does not establish 'materiality'

in the constitutional sense").

Under the federal Constitution, the same "reasonable probability" materiality standard applies whether or not the defense requested production of the suppressed evidence. *Bagley*, 473 U.S. at 682, 105 S. Ct. 3375, 3383. In contrast, under the New York Constitution, when the defense specifically requested the suppressed evidence, due process is violated where there is a "reasonable possibility" that disclosure of the evidence would have affected the outcome of the proceedings. *People v. Vilardi*, 76 N.Y.2d 67, 77, 556 N.Y.S.2d 518, 524 (1990). New York's "reasonable possibility" standard thus parallels the federal "reasonable probability" standard but is more exacting. *Id.*, 556 N.Y.S.2d at 524. Accordingly, where a court correctly concludes that a defendant's due process rights were not violated under New York's "reasonable possibility" standard, the defendant's due process rights necessarily also were not violated under the federal "reasonable probability standard. *See id.* 556 N.Y.S.2d at 524.

### 2. Application

Jones argues that the State violated *Brady* by failing to disclose the following information:

(1)    All evidence regarding Corniel's business of robbing drug dealers using his guns and bulletproof vest.

(2)    All evidence regarding Corniel pistol-whipping of others and gun-toting threats.

(3)    That Corniel had confessed to the robberies, pistol-whipping, and armed confrontation.

(4)    That Corniel had signed a written confession, witnessed by his attorney, to the gun and fake drug charges.

(5)    And that the prosecution was not prosecuting him for most of that activity.

(Pet. Mem. at 26-27.) Aside from the decision not to charge, the § 440 court explicitly considered all of the undisclosed information and concluded that that information did not

30

raise a "reasonable possibility" that it would have changed the result of the proceeding "sufficient to undermine the confidence in the verdict." (§ 440 Decision at 16-17.)

Jones now argues that (1) the § 440 court applied the wrong standard in determining whether the suppressed evidence was material; and, alternatively, (2) the § 440 court unreasonably applied federal constitutional precedent. (Pet. Mem. at 27-28.) The Court addresses each in turn.

### a.   The § 440 Court Applied The Correct Standard

In support of his argument that the § 440 court applied the wrong legal standard in assessing materiality under *Brady*, Jones points to two statements in the § 440 Decision, which he characterizes as follows: (1) the § 440 court required Jones "to show 'that the withheld evidence would have led the jury to doubt virtually everything that the People's witnesses had testified to about the crime'"; and (2) "according to the state court, because 'the undisclosed evidence would not have directly contradicted Corniel's testimony nor would it have negated defendant's guilt' it was not material." (Pet. Mem. at 27 (quoting § 440 Decision at 20-21).) Jones takes both of those comments out of context. The § 440 court clearly and expressly applied the correct materiality standard.

As a preliminary matter, Jones omits two crucial words from the court's first comment. The court actually said that Jones would need to show that there was "a **reasonable possibility** that the withheld evidence would have led the jury to doubt virtually everything that the People's witnesses had testified to about the crime." (§ 440 Decision at 20 (emphasis added).) The cropped version of the court's statement attacked by Jones, if taken out of context of the § 440 Decision, would transgress the correct standard in two respects. First, it would place a higher burden on Jones to prove that the withheld evidence would have had the requisite impact, rather than to demonstrate only

31

that the evidence had a "reasonable possibility" (under the state standard) or "reasonable probability" (under the federal standard) of doing so.  But, again, the standard challenged by Jones, which omits two critical words, was not the standard invoked by the § 440 court.

The second part of the first comment challenged by Jones finds more support in the actual text of the § 440 Decision.  The sentence at issue refers to Jones having to show "a reasonable possibility that the withheld evidence would have led the jury to **doubt virtually everything that the People's witnesses had testified to about the crime**." (§ 440 Decision at 20.)  That formulation appears to be a higher burden than the correct standard, which only requires the defendant to show a reasonable probability (or possibility, under the state standard), that "**the result of the proceeding would have been different**." *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383.  Although that snippet of the § 440 Decision may be inartfully worded, the Court understands it not as applying the wrong standard, but instead situating the suppressed evidence within the State's case as a whole.

Specifically, the statement appears in the context of the court's discussing the undisclosed evidence about Corniel's prior acts of violence and drug dealing.  The court observed that that evidence would not have contradicted any of Corniel's testimony or tended to show that Jones was misidentified.  (§ 440 Decision at 20.)  Rather, it would have been mere impeachment evidence on a collateral issue.  As a result, the court noted, it would be difficult for Jones to show that the evidence was material, particularly given "virtually everything that the People's witnesses had testified to about the crime." (§ 440 Decision at 20.)   Indeed, the § 440 Decision's next sentence suggests exactly that: "The mere possibility that a piece of undisclosed evidence might have helped the defense or

might have affected the outcome of the trial, does not establish materiality in the constitutional sense." (§ 440 Decision at 20-21 (quoting *Agurs*, 427 U.S. at 110, 96 S. Ct. at 2400).)

The second comment challenged by Jones appears in the § 440 court's discussion of Jones's argument that Corniel's credibility was critical at trial because, if Corniel's claim that Jones said "pop him" was believed, a conviction was inevitable. (§ 440 Decision at 21.) The court observed that Corniel was impeached on that specific point "when, on cross-examination, he admitted he did not know who said those words." (§ 440 Decision at 21.) The court then made the second challenged comment, stating that "the non-disclosed evidence would not have directly contradicted Corniel's testimony nor would it have negated defendant's guilt." (§ 440 Decision at 21.)

Requiring that the evidence *had to* directly contradict Corniel's testimony or negate defendant's guilt to find materiality would be a misstatement of the standard, which only requires a reasonable probability that there may have been a different outcome. *Certified Environmental*, 753 F.3d at 91. But that is not what the court said. The court was not invoking a standard. Rather, it was describing the nature of the impeachment evidence, which would have gone to Corniel's general credibility rather than contradicting his testimony or tending to negate defendant's guilt. The Court then concluded with a sentence consistent with the correct State standard more favorable to Jones, saying that "defendant's inability to use this information at trial clearly had no impact on the outcome of the trial and there was no reasonable possibility that [defendant's inability to use the information] contributed to the verdict." (§ 440 Decision at 21.)

33

Accordingly, neither of the two sentences cited by Jones indicate that the § 440 court applied an incorrect, less favorable materiality standard. Moreover, even if either challenged statement were read as an incorrect formulation of the standard, a complete reading of the § 440 Decision shows that the court relentlessly applied the correct standard, consistently examining whether the withheld evidence created a reasonable probability, or even just the possibility, of a different result or undermined confidence in the verdict, even when that evidence was considered cumulatively.  (*See, e.g.*, § 440 Decision at 16 (stating that withheld evidence is material "'when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different, such that the failure to disclose undermines confidence in the verdict'" (quoting *Certified Environment* and *Whitley*)), 17 ("none of the omitted material separately or collectively raises any reasonable possibility sufficient to undermine confidence in the verdict"), 17 ("the standard to be applied is whether there is a 'reasonable possibility' that the failure [to disclose] contributed to the verdict"), 18 ("there is no reasonable possibility the proceedings would have been different if the evidence about the above items had been disclosed"), 21 ("defendant's inability to use this information at trial clearly had no impact on the outcome of the trial and there was no reasonable possibility that it contributed to the verdict"), 25 ("even if the defense had been able to use the undisclosed information … there is no reasonable possibility that such cross-examination would have influenced the jury's verdict").

In sum, it is clear from a review of the § 440 Decision that the state court applied the correct materiality standard under *Brady* as well as the more exacting State standard. Jones's argument to the contrary is without merit.

####    b.    **Substance Of *Brady* Claim**

In the alternative, Jones asserts that the § 440 court unreasonably applied constitutional precedent in concluding that the suppressed evidence was not material. (Pet. Mem. at 28.) Jones argues that the suppressed evidence was material because Corniel's testimony that Jones said "pop him" was critical to establishing the requisite intent for manslaughter and gang assault, and the undisclosed evidence would have caused the jury to question Corniel's credibility and motive to lie. (Pet. Mem. at 28-32.)

Jones is incorrect for two reasons. First, as the State argues, there is no reasonable probability that further impeachment of Corniel would have had any effect on the outcome of the proceedings because "Corniel's testimony was wholly unnecessary to the jury's determination." (Resp. Mem. at 29-32.) That is evident from the fact that the jury convicted Jones despite the fact that Corniel was thoroughly impeached on the specific statement that Jones argues was crucial to his conviction – that Jones said "pop him." Second, the defense had ample evidence available to it to impeach Corniel with respect to both his general untruthfulness and his motive to lie. The additional unavailable evidence was merely cumulative on both points, such that there is no reasonable probability that its disclosure would have led to a different result in the proceedings.[27] The Court addresses each of those reasons in turn.

---

[27] The Court uses the terms "available" and "unavailable" to distinguish two types of undisclosed material. "Available" evidence refers to material not disclosed by the prosecution but nevertheless obtained before trial though the diligence of co-defendant's counsel Mr. Klein. "Unavailable" evidence refers to undisclosed material that the defense did not otherwise obtain for trial.

### i.   There Was Overwhelming Evidence Of Jones's Guilt Without Corniel's Testimony

Jones was convicted of second-degree manslaughter and first-degree gang assault. (Tr. 1137.) In New York, a person commits first-degree manslaughter when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20(1). A person commits first-degree gang assault when "[w]ith intent to cause serious physical injury to another person and when aided by two or more other persons actually present, he causes serious physical injury to such person or to a third person." N.Y. Penal Law § 120.07. In addition, New York has accomplice liability, a charge that was given to the jury in this case (Tr. 1082-83), which dictates as follows:

> [w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

N.Y. Penal Law § 20.00.

Jones thus could be convicted of the charges for which he was found guilty if the jury determined that he had "intent to cause serious physical injury" to Peguero. In New York, "serious physical injury" is defined as:

> physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

N.Y. Penal Law § 10.00(10).

36

Even without Corniel's testimony, the video evidence and testimony of the store clerk, Saleh, overwhelmingly established that Jones had the intent to cause Peguero serious physical harm.

The video evidence captured the following.  Jones led the group as it stormed through the BP gas station toward the bodega.  (BP Video at 21:43.)  Jones also led the group as it followed Peguero into the bodega.  (Bodega Video II at 22:40:23, IV at 22:40:00-22, VI at 22:40:22-24).)  Upon entering the bodega, Jones grabbed Peguero by the neck and dragged him to the back of the store.  (Bodega Video II at 22:40:27-32, III at 22:40:30-32, IV at 22:40:28-30.)  Critically, Jones held Peguero and looked at Thompson as Thompson approached with the gun in his hand.  (Bodega Video II 22:40:33; Tr. 170-173.)  Saleh confirmed what the video appears to depict, testifying that Jones was trying to hold Peguero by his face and neck as Thompson ran towards them holding the gun out in front of him in his right hand.  (Tr. 170-73.)

Jones did not appear to express any surprise at seeing the gun.  To the contrary, when Peguero broke free, Jones continued to pursue him while Barnhill struck him with a bag of ice, preventing him from escaping and leading to Thompson shooting him dead.  (Bodega Video III at 22:40:34-37, VI at 22:40:40-41.)

Jones's actions, as captured in the video and recounted by Saleh, provide overwhelming evidence from which to infer that Jones intended to cause Peguero serious physical injury.  *See, e.g.*, *Hayes v. Ercole*, No. 09-CV-5178, 2012 WL 3031462, at *7 (S.D.N.Y. June 15, 2012) (aiding in assault with fellow assailant known to have gun established intent to cause serious physical injury), *R. & R. adopted*, 2012 WL 3029912 (S.D.N.Y. July 25, 2012); *People v. Shoy*, 178 A.D.3d 621, 115 N.Y.S.3d 289 (1st Dep't

2019) (video showing defendant committing violent acts, and facilitating worse violent acts by others by preventing victim from escaping, established intent to cause serious physical injury), *leave to appeal denied*, 35 N.Y.3d 974, 1125 N.Y.S.3d 12 (2020); *People v. Guerrero*, 150 A.D.3d 883, 884-85, 55 N.Y.S.3d 67, 70 (2d Dep't 2017) (evidence demonstrating that defendant continued to participate in attack after companions' intent to use knives became clear established intent to cause serious physical injury (collecting cases)). The Appellate Division made just that observation in its decision on Jones's Confrontation Clause claim:

> by itself, a surveillance video tape depicting defendant's continuing aggressive conduct toward the victim was enough to warrant the conclusion that defendant shared his companions' intent to at least cause the victim serious physical injury.

*Jones*, 167 A.D.3d 477, 478 87 N.Y.S.3d 884, 844 (1st Dep't 2018) (collecting cases).

With such overwhelming evidence of Jones's guilt even without Corniel's testimony, there can be no "reasonable probability" that additional evidence capable of impeaching Corniel would have led to a different outcome in the proceedings. *See Leka*, 257 F.3d at 104 (with respect to *Brady* claim, "[m]ateriality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted"); *Bruno v. Griffin*, No. 16-CV-4432, 2017 WL 10526238, at *4 (S.D.N.Y. Sept. 5, 2017) (petition "cannot establish he was prejudiced because of the overwhelming evidence of guilt presented by the People" (internal quotation marks omitted)), *R. & R. adopted*, 2018 WL 4521213 (S.D.N.Y. Sept. 21, 2018); *May v. Hoke*, 711 F. Supp.703, 712 (E.D.N.Y.1988) ("In short, this court finds that even if any *Brady* material was withheld with respect to the investigation of Officer Beltrani, any ensuing error was harmless because, in light of

overwhelming evidence of guilt, there simply was no reasonable probability' that collateral impeachment of Beltrani would have resulted in a different verdict" (internal quotation marks omitted)).

Furthermore, Corniel was thoroughly impeached on the specific testimony that Jones argues was critical to his conviction – whether Jones said, "pop him." Defense counsel confronted Corniel with his own grand jury testimony in which Corniel said that Barnhill was the one who said, "pop him." (Tr. 448-51.) Corniel never offered a convincing explanation for his inconsistency; instead, he testified that he was not facing the altercation at the time the words were said and thus could not say who it was that said, "pop him." (Tr. 552-54.) In addition, as discussed below, Corniel was impeached on his general credibility and motive to lie. It is exceedingly unlikely that the jury's guilty verdict rested on the impeached testimony of one untrustworthy witness with motive to lie rather than the video evidence and testimony of the store clerk.[28]

Even without Corniel's testimony, there was overwhelming evidence of Jones's guilt, and thus no "reasonable probability" that additional evidence capable of impeaching Corniel would have led to a different outcome in the proceedings.[29] *See Leka*, 257 F.3d at 104.

---

[28] Notably, when addressing Jones's intent in closing argument, the State emphasized Jones's behavior in the videos first and foremost, bringing in Corniel's testimony only "if [Jones's] actions didn't speak loud enough about his intent." (Tr. 1015-25.)

[29] Both parties argue that Jones's acquittal of second-degree murder supports their position. Jones argues that it demonstrates that the evidence against Jones was not overwhelming and, since the jury found intent to cause serious physical injury but not intent to kill, "it is likely that they placed great weight in the only direct evidence of intent to injure: Jones's alleged statement of 'pop him.'" (Pet. Mem. at 32.) The State counters that the acquittal shows that the jury already did not believe Corniel's testimony that Jones

## ii.    The Unavailable Evidence Was Cumulative

Even if Corniel's testimony was critical to the outcome of the proceedings, which it was not, the unavailable evidence still would not have been material under *Brady*. As the § 440 court noted, the unavailable evidence did not directly contradict any of Corniel's testimony (or any other evidence, for that matter). The unavailable evidence thus would have needed to undermine Corniel's general credibility so much that there would be a reasonable probability that the outcome of the proceedings would have been different. The unavailable evidence was not capable of creating such a reasonable probability because Corniel's general credibility was already thoroughly undermined.

Jones makes two primary arguments to the contrary: (1) the additional undisclosed conduct involved in the offenses about which defense counsel knew, and the undisclosed offenses about which the defense knew nothing, undermined Corniel's credibility more than any of the information available to the defense; and (2) Corniel's confession to those bad acts, and the State's decision not to charge him for them, showed his motive to lie more than any of the available information.   (Pet. Mem. 28-33.)   Neither argument withstands scrutiny.

With respect to the first argument, a brief recap of what offenses defense counsel knew – and what he knew about them – versus what he did not know, is helpful. Through the State's witness disclosure list, defense counsel knew that Corniel had a youthful

---

said "pop him" because, if it had, that would have demonstrated intent to kill and thus sealed Jones's fate as guilty of murder. (Resp. Mem. at 38.) Respondent's argument seems more logical to the Court. However, it is unwise to attempt to draw inferences from a jury's choice to acquit on one charge and convict on another, a decision which may simply reflect "mistake, compromise, or lenity." *United States v. Powell*, 469 U.S. 57, 65, 105 S. Ct. 471, 476 (1984).

adjudication for petit larceny, a conviction for possession of marijuana, and a conviction for fourth-degree possession of a weapon and disorderly conduct. (Disclosure List, A. 476.).)   Through the felony complaint and VDF in Corniel's open gun case, defense counsel knew that Jones had an open gun case; that a search of his residence uncovered a gun, ammunition, a bulletproof vest, and marijuana; that he admitted that the gun and vest were his; he had had the gun for three years; he was in the business of selling fake drugs; he said he needed the gun and vest because of the dangers of selling fake drugs and his troubles on the streets; he previously had another gun but sold it; and he had worn the gun and vest onto the streets. (Corniel Indictment at 1; VDF at 2.)

To that, the undisclosed and unavailable evidence added that Corniel's youthful offender adjudication was for selling a bag of potatoes disguised as a fake gun; his fourth-degree weapon possession charge was for having a pen knife on the street that he tried to discard as police approached; additional drug paraphernalia and a sword were found during the search of his home; and he had admitted to robbing many people, having no remorse about it, working with someone who had robbed 600 people, pistol-whipping a rival, confronting another rival with his gun and vest, and hoping to sell enough drugs to retire. (O'Doherty Notes; O'Doherty Suppression Tr. 14, 31, 87-90; Corniel Sentencing Tr. 24, 29, 51.)

The thrust of Jones's argument is that the information he did not know demonstrated Corniel's untrustworthiness more than the information he did know. The most convincing evidence of Corniel's untrustworthiness, however, was that Corniel was in the business of selling fake drugs. As Jones aptly notes, "Corniel's career was literally built on lies: he lied serially to his customers about what he was selling them, and

accepted money for fake drugs and fake firearms." (Pet. Mem. at 30.)  Defense counsel, however, had available evidence before trial that Corniel was engaged in the business of selling fake drugs.  (Corniel Complaint at 1; VDF at 2.)  Any additional evidence of his dishonesty contained in the unavailable evidence – such as the fact that he attempted to sell a fake gun – was merely cumulative on the issue of his dishonesty and thus not material.  *United States v. Ramirez*, 628 F. App'x 15, 17 (2d Cir. 2015) (with respect to *Brady* claim, "no prejudice ensued because the Witness's credibility had been similarly called into question in the same respects by [other] evidence"); *United States v. Wong*, 78 F.3d 73, 80 (2d Cir. 1996) (where defense counsel already elicited witness's dishonesty and motive to lie, additional evidence of dishonest was not material under *Brady*); *Bouloute v. United States*, 645 F. Supp.2d 125, 134 (E.D.N.Y. 2009) (additional evidence that admitted drug trafficker engaged in other drug trafficking was merely cumulative and thus not material under *Brady*).

The Court notes that the unavailable evidence is different in kind in one respect from the evidence available to defense counsel.  None of the evidence available to counsel before trial included what could be characterized as acts of violence: robberies, pistol whippings, etc.  Those acts, however, were less directly relevant to Corniel's dishonesty than the evidence that Corniel's profession of selling fake drugs "was literally built on lies," and thus less likely to make the jury believe that he would lie about the fact that Jones said, "pop him."  *See United States v. Walker*, 974 F.3d 193, 207 (2d Cir. 2020) ("violent crimes, however abhorrent, often are not crimes of dishonesty, and may not meaningfully reflect on a witness's truthfulness"), *cert. denied*, No. 20-7183, 2021 WL 2519317 (June 21, 2021); *United States v. Estrada*, 430 F.3d 606, 618 (2d Cir. 2005)

("convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not").

In addition, defense counsel did have access before trial to evidence that Corniel had a gun and bulletproof vest, felt he needed the gun and vest because of the dangers of drug dealing and troubles he had on the street, and had worn the gun and vest in the street. (Corniel Complaint at 1; VDF at 2.) All of that evidence certainly painted Corniel as someone involved in a violent profession. *United States v. Delva*, 858 F.3d 135, 155 (2d Cir. 2017) ("Drug trafficking is plainly a serious crime, one often accompanied by violence"); *United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir. 1981) ("narcotics traffickers are often armed and violent") *Coleman v. Hauck*, No. 09-CV-1391, 2012 WL 4480684, at *3 (N.D.N.Y. Sept. 26, 2012) (drug trafficking is a serious crime known for violence); *United States v. Granderson*, 182 F. Supp.2d 315, 325 n.4 (W.D.N.Y. 2001) ("The relationship between drugs, guns, and violence is well documented in the decisional law of this Circuit" (collecting cases)).

And, in any event, the Second Circuit has routinely held that suppressed impeachment evidence was cumulative, and thus not material, even where it was different in kind. *Gonzalez v. United States*, 667 F. App'x 307, 308 (2d Cir. 2016) (undisclosed Civilian Complaint Review Board complaints against the sole eyewitness at trial were not material since the witness had been thoroughly impeached with prior inconsistent statements and his motive to lie); *United States v. Persico*, 645 F.3d 85, 112 (2d Cir. 2011) (evidence that witness was allowed to keep $1.65 million deemed immaterial because witness already impeached by "manifest antipathy" toward defendants and internally inconsistent testimony); *Shabazz v. Artuz*, 336 F.3d 154, 167 (2d Cir. 2003)

43

(government witnesses' expectation of receiving favorable treatment for their testimony was not material because the witnesses had already been impeached by their drug use and previous lies); *see also United States v. Jackson*, 695 F. App'x 605, 607 (2d Cir. 2017) ("[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial").

Accordingly, the additional evidence about Corniel's prior bad acts was not material under *Brady*.

Jones's second argument – that the unavailable evidence about Corniel's motive to lie was more significant than the evidence of Corniel's motive to lie that was available to the defense – is also unavailing. Again, a brief review of the evidence that was and was not available to the defense is helpful. Defense counsel knew from the felony complaint and VDF in the open gun case that Corniel had confessed to possessing the gun, bulletproof vest, and marijuana, as well as to uncharged crimes such as selling his other gun and going into the street armed with his gun and bulletproof vest. (Corniel Complaint at 1; VDF at 2.) Through the Stipulation presented at trial, defense counsel was also able to show that Corniel had an open marijuana case and an open gun case involving the details outlined above; that he was facing up to 15 years if convicted in the open gun case; and that ADAs had met with him during a lunch break during trial and stated that the DA's office would "make the nature and extent of Mr. Corniel's cooperation in [the] case known" to the sentencing court on his open gun case. (Stipulation at 1-2.)

The suppressed evidence included the fact that Jones's confession to the open gun charge was signed and witnessed by his attorney and that he had confessed to numerous robberies, a pistol-whipping, and confronting someone with guns and a bulletproof vest, none of which the State had charged him with.  (O'Doherty Notes; O'Doherty Suppression Tr. 14, 31, 87-90.)

Given that the jury already knew that Corniel had confessed to the open gun charge, faced 15 years on that charge, and the State had offered to make his cooperation in the case known to the sentencing judge in his open gun case, the additional evidence of bias was unquestionably cumulative.  *See United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (evidence of interest in bail arrangement not material under *Brady* where defense counsel already had "abundant evidence" of motive to lie); *United States v. Lipton*, 467 F.2d 1161, 1166 (2d Cir. 1972) (considering ample available evidence of witness's motive to cooperate with government, additional such evidence was not material under *Brady*); *Roth v. United States*, No. 09-CV-8712, 2014 WL 896736, at *4 (S.D.N.Y. Mar. 3, 2014) (motive to lie in the form of payment of reward was not material under *Brady* where credibility was already impeached with other evidence of bias, including possible leniency); *Fogel v. Lee*, No. 13-CV-2297, 2013 WL 6199981, at *7 (E.D.N.Y. Nov. 26, 2013) (additional basis on which to impeach is not material under *Brady*, "particularly ... where ample evidence has been introduced to show the witness's propensity and motive to lie" (citing *United States v. Petrillo*, 821 F.2d 85, 89-90 (2d Cir. 1987)).

Jones cites no cases where the difference in kinds of available and unavailable impeachment evidence like those at issue here was material under *Brady*, let alone cases

45

that would allow the Court to hold that the state court unreasonably applied clearly established federal law. Jones instead relies extensively on *Wearry v. Cain*, 577 U.S. 385, 136 S. Ct. 1002 (2016), arguing that it supports the proposition that, even though there had been impeachment of Corniel, further impeachment cannot be considered immaterial. (Pet. Mem. at 29-32.) *Weary*, however, is as distinguishable from this case as night from day.

In *Wearry*, a murder went unsolved for two years. *Id.* at 387; 136 S. Ct. at 1003. Then, a jailhouse informant named Sam Scott contacted authorities and implicated Michael Wearry. *Id.* at 387; 136 S. Ct. at 1003. Scott's story originally contradicted the facts of the murder, then changed over time until he testified at trial. *Id.* at 387; 136 S. Ct. at 1003. At trial, he said that a man named Randy Hutchinson had flagged down the victim, pulled him out of the car, and shoved him in the trunk; then Hutchinson, Wearry, and three others drove the victim around and ultimately ran the victim over, killing him. *Id.* at 387; 136 S. Ct. at 1003. Scott admitted before the jury that he had changed his story over time. *Id.* at 387; 136 S. Ct. at 1003. Another jailhouse informant, Eric Brown, testified that he had seen Wearry in the car with the victim, also admitted to making prior inconsistent statements, but said that he did not seek prosecutorial favor for his testimony. *Id.* at 387; 136 S. Ct. at 1003. There was no physical evidence; certainly no video of the crime. *Id.* at 387-88; 136 S. Ct. at 1003. And Wearry had an alibi: he was at a wedding 40 miles away. *Id.* at 388; 136 S. Ct. at 1003.

After trial, four pieces of suppressed evidence were discovered: Scott had tried to get another prisoner to falsely testify against Wearry to enhance that prisoner's chance of getting out of jail; Scott had told another prisoner that he wanted Wearry to get the

needle because Wearry had screwed him over; Brown had twice sought a deal from the State for his testimony, contrary to what he told the jury; and Hutchinson had recently had surgery that would have likely prevented him from running into the street, flagging down the victim, pulling him from the car, and shoving him in the trunk. *Id.* at 388-90; 136 S. Ct. at 1004.  Unsurprisingly, the Court found a *Brady* violation.

Jones latches on to the fact that Scott was already impeached yet the suppressed evidence was found to be material.  Jones ignores the facts that "[t]he State's trial evidence resemble[d] a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi"; "any juror who found Scott more credible in light of Brown's testimony might have thought differently had she learned that Brown may have been motivated to come forward … by the possibility of a reduced sentence"; and that the state court being reversed by the Supreme Court had "improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively" and "failed even to mention the statements of the two inmates impeaching Scott." *Id.* at 393-94; 136 S. Ct. at 1006-07.

Jones's case shares none of those crucial attributes with *Wearry*.  Most critically, where evidence of Wearry's guilt was thin, the evidence of Jones's guilt was overwhelming.  The *Wearry* court noted the significance of the weak evidence in that case: "If the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 393; 136 S. Ct. at 1006 (internal quotation marks and brackets omitted).

In Jones's case, in contrast, the evidence of Jones's guilt was overwhelming; the defense was able to impeach Corniel on the very testimony that Jones argues was critical to his conviction (that Jones said "pop him"); and the defense had ample available

evidence to challenge Corniel's credibility and motive to lie such that additional evidence of either would have been merely cumulative.

For all of the above reasons, the undisclosed evidence concerning Corniel was not material under *Brady*.[30]  *See United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) ("undisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict' (quoting *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766)); *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998) ("It is well settled that where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial"); *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) ("where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material"); *Wong*, 78 F.3d at 79 ("a new trial is warranted only if 'the evidence is material, noncumulative, and would probably lead to an acquittal'" (quotin-g *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir.1993)). Accordingly, the state courts did not unreasonably apply clearly established federal precedent in finding no *Brady* violation.

## C.   The Right To Confrontation Claim

Jones argues that his right to confront the witnesses against him under the Confrontation Clause of the Sixth Amendment was violated when Corniel invoked his right

---

[30] The absence of materiality does not excuse the State's conduct.  The evidence available to the defense that rendered the undisclosed evidence immaterial under *Brady* was divulged not because the State complied with its *Brady* obligations but instead because counsel for the co-defendant Thompson was diligent and resourceful.

to remain silent, under the Self-Incrimination Clause of the Fifth Amendment, and the trial court refused to strike Corniel's testimony as a result. (Pet. Mem. at 34-39.)  Jones is mistaken.

### 1.    Relevant Law

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant's right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The right includes "more than being allowed to confront the witness physically." *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S. Ct. 1431, 1435 (1986) (internal quotation marks omitted).  Importantly, it "includes the right to conduct reasonable cross-examination." *Olden v. Kentucky*, 488 U.S. 227, 231, 109 S. Ct. 480, 483 (1988).  That right, however, is not absolute. *United States v. Brooks*, 82 F.3d 50, 54-55 (2d Cir.), *cert. denied*, 519 U.S. 907, 117 S. Ct. 267 (1996).  It may, "in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Michigan v. Lucas*, 500 U.S. 145, 149, 111 S. Ct. 1743, 1746 (1991) (internal quotation marks omitted).

Specifically, "a witness' testimony may, in some cases, be used against a defendant, even though the witness invokes his privilege against self-incrimination during cross-examination." *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S. Ct. 60 (1963).  The Second Circuit has summarized the proper way to resolve the competing interests as follows:

> To reconcile a defendant's rights under the confrontation clause with a witness['s] assertion of the fifth amendment privilege, a court must initially consider: (1) whether the matter about which the witness refuses to testify is collateral to his or her direct testimony, and (2) whether the assertion of the privilege precludes inquiry into the details of his or her direct testimony.  If the court determines that the privilege has been invoked with respect to a collateral matter, or that the invocation does not preclude inquiry into the witness' direct

49

> testimony, then the defendant's right to cross-examine has not been impinged and no corrective action is necessary. Conversely, the sixth amendment is violated when a witness asserts the privilege with respect to a non-collateral matter **and** the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony. To remedy such a violation, ... if the privilege has not been waived, or if the witness simply refuses to testify, the witness' direct testimony should be stricken in whole or in part.

*Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir. 1991) (emphasis in original) (internal citations omitted), *cert. denied*, 502 U.S. 926, 112 S. Ct. 341 (1991).

Matters that "bear only on the credibility of the witness" are collateral. *Cardillo*, 316 F.2d at 611. That includes questions about unrelated crimes. *United States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996) (questions about prior drug deals were collateral), *cert. denied*, 519 U.S. 907, 117 S. Ct. 267 (1996). Matters "tending to establish a reason to fabricate," however, are "never collateral." *Justice v. Hoke*, 90 F.3d 43, 48 (2d Cir. 1996) (internal quotation marks omitted). That includes information about exchanges made for testimony, including cooperation agreements. *See Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435.

As noted, however, the Sixth Amendment is ultimately violated only "when a witness asserts the privilege with respect to a non-collateral matter **and** the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony." *Bagby*, 932 F.2d at 135 (emphasis in original); *see also Dunbar v. Harris*, 612 F.2d 690, 693 (2d Cir. 1979) ("The question is whether the defendant's inability to examine the witness precludes defendant from testing the truth of the witness's direct testimony or whether the answers solicited might have established untruthfulness with respect to specific events of the crime charged" (internal quotation marks and citation omitted). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient

50

to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990).

Additionally, harmless-error analysis applies to Confrontation Clause violations, such that a court must assess "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438.

### 2.   Application

Corniel was conferred immunity, and the defense was able to question him, on everything he testified to on direct examination and everything about the incident in the bodega itself.   (Tr. 435-50, 542-49.)   Nevertheless, Jones argues that his right to confrontation was violated when the trial court refused to strike Corniel's testimony after Corniel refused to testify about (1) his actions earlier on the day of the crime; (2) his prior bad acts, prior crimes, employment in the drug trade, and related conduct; and (3) his cooperation agreement. (Pet. Mem. at 34-39.)   The Court finds to the contrary and addresses each subject in turn.

### a.   Corniel's Actions Earlier On The Day Of The Crime

Jones asserts that "Corniel invoked the Fifth Amendment in response to questions about his actions on the day of the crime, making it impossible to the jury to assess the credibility of his direct account." (Pet. Mem. at 37.)   Such matters were material, Jones argues, because they may have "'expose[ed] possible errors in narration, weakness in memory or difficulty in perception.'" (Pet. Mem. at 37 (quoting *United States v. Calvente*, 722 F.2d 1019, 1024 (2d Cir 1983)).)   Jones is mistaken, however, about the content of Corniel's testimony.

51

Corniel was given immunity, and answered questions, about his actions on the day of the crime that may have affected his memory and perception and introduced errors into his narration. He testified that he had smoked an entire marijuana cigarette by himself about an hour prior to the incident and was high at the time of the incident. (Tr. 507, 513-19, 528-30.) He also testified that that was the only marijuana cigarette he had smoked that day. (Tr. 530.) Given that testimony, the jury certainly possessed sufficient facts to make a "discerning appraisal" of any impairment of Corniel's perception during the incident. *See Roldan-Zapata*, 916 F.2d at 806. With Corniel admitting that he had smoked a marijuana cigarette one hour before the incident, rendering him high during the incident, it is unclear what he could have testified about from earlier in the day that could have caused the jury to further question his perception at the time of the incident, and defense counsel proffers nothing. Jones's right to confrontation thus was not violated by Corniel's failure to answer additional questions about his conduct from earlier on the day of the incident.

### b.    Corniel's Prior Bad Acts, Prior Crimes, Employment In The Drug Trade, And Related Conduct

Corniel's prior bad acts and crimes, employment in the drug trade, and related conduct were all clearly collateral matters. As such, his refusal to answer questions about them on Fifth Amendment grounds did not violate Jones's right to confrontation. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974) ("the introduction of evidence of a prior crime is ... a general attack on the credibility of the witness"); *United States v. Brooks*, 82 F.3d 50, 54 (2d Cir.) (questions about prior drug deals were collateral), *cert. denied*, 519 U.S. 907, 117 S. Ct. 267 (1996); *Dunbar*, 612 F.2d at 694 (questions about witness's "involvement in drug dealings other than those for which

appellant was charged" were purely collateral matters); *Cardillo*, 316 F.2d at 611 (questions related to a witness's past crimes, charged and uncharged, were purely collateral); *Avincola v. Stinson*, 60 F. Supp.2d 133, 156 (S.D.N.Y. 1999) ("A witness' testimony about other unrelated crimes is collateral" (collecting cases)); *Carmona v. Attorney General Of The State Of New York*, No. 96-CV-8045, 1997 WL 876737, at *12 (S.D.N.Y. 1997) (questions about use of gun during a burglary "was relevant only to impeachment, an issue purely collateral to his direct, eyewitness testimony").

### c.    Cooperation Agreement

Jones is correct that cooperation agreements – even informal ones – are evidence of bias, not collateral, and encompassed by the Confrontation Clause. (Pet. Mem. at 35-36 (citing, *inter alia*, *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435 ("prohibit[ing] **all** inquiry into the possibility that Fleetwood would be biased as a result of the State's dismissal of his pending public drunkenness charge" (emphasis in original)).) Here, however, the cooperation agreement was disclosed to the jury. (Tr. 860-61.) The Stipulation informed the jury of Corniel's open gun charge; that Corniel had confessed to possessing the gun, a bulletproof vest, and marijuana, as well as possessing the gun and vest because of the dangers of being involved in the drug trade and having trouble on the street; that Corniel was facing fifteen years in prison on the open gun charge; and the prosecution would make the extent of Corniel's cooperation in Jones's case known to the sentencing judge in Corniel's open gun case. (Stipulation at 1-2.) That is a far cry from *Van Arsdall*, where the jury was provided no information about the dismissed public drunkenness charge and possible resulting bias.

Ultimately, the Confrontation Clause is only "violated when a witness asserts the privilege with respect to a non-collateral matter **and** the defendant is deprived of a

meaningful opportunity to test the truth of the witness' direct testimony." *Bagby*, 932 F.2d at 135 (emphasis in original). "As long as 'the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility,' there is no violation of the Confrontation Clause." *Flournoy v. Brown*, No. 09-CV-2338, 2012 WL 1450288, at *5 (E.D.N.Y. Apr. 26, 2012) (quoting *United States v. Rosa*, 11 F.3d 315, 336 (2d Cir.1993); *see also Roldan-Zapata*, 916 F.2d at 806 ("Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility"). Given the Stipulation disclosing that Corniel was facing fifteen years in prison, and the that the prosecution would make the extent of his cooperation in Jones's case known to his sentencing judge, the jury possessed more than sufficient facts to make a "discriminating appraisal" of Jones's possible motive to lie.

Jones points to no case – and this Court is not aware of any – in which any Court has held that a defendant's right to confrontation was violated where a witness refused to answer questions about a cooperation agreement, but the cooperation agreement was stipulated to by the parties and thereby disclosed to the jury.[31] Accordingly, this Court cannot say that the state courts unreasonably applied clearly established federal law or

---

[31] In many instances, courts have held that acceptance of a stipulation waives a defendant's right to confrontation. *United States v. Stitsky*, 536 F. App'x 98, 107 (2d Cir. 2013) ("the stipulation effectively waived defendants' right of confrontation"); *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir.1999) ("defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound"); *Calvo v. Donelli*, No. 06-CV-1794, 2007 WL 1288098, at *11 (E.D.N.Y. Apr. 30, 2007) (same). Here, Jones's counsel protested that he was accepting the Stipulation only because he was not able to cross-examine Corniel on the agreement, and thus the Stipulation was the only way to get any evidence of bias before the jury. Jones's counsel could have refused the Stipulation and, without it, reversal could well have been warranted. The Court, however, does not rest its decision on waiver.

otherwise violated Jones's Sixth Amendment right to confrontation. *See Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009).

Jones nonetheless complains that the Stipulation is deficient as it did not include the facts that the sword and other paraphernalia were recovered in the search of Corniel's home or that Corniel also confessed to robberies, a pistol whipping, and an armed confrontation. (Pet. Mem. at 36, 39.) Continuing Jones's logic, the argument is that, with respect to those undisclosed offenses, this case is like *Van Arsdall*, where the jury was prohibited from hearing any information about dismissed charges and potential resulting bias. *See* 475 U.S. at 679, 106 S. Ct. at 1435. Here, however, there is no indication that the State ever charged Jones with respect to the sword, fake drugs, or gratuitous confessions to acts of violence or even that the State could have done so or threatened to do so.

Moreover, as discussed above, because the jury already knew that Corniel faced a fifteen-year sentence on the open gun charge, and that the prosecution would make the extent of his cooperation in Jones's case known to the sentencing judge in Corniel's open gun case, the jury already possessed more than sufficient facts to make a "discriminating appraisal" of Jones's possible motive to lie. *See Roldan-Zapata*, 916 F.2d at 806; *Flournoy*, 2012 WL 1450288 at *5. Once again, Jones points to no case – and this Court is not aware of any – where any court has held that a defendant's right to confrontation was violated where the parties stipulated to there being a cooperation agreement regarding a serious pending charge corroborated by physical evidence and a confession, but the stipulation omitted other conduct for which it was not clear the State could have, or threatened to, charge the witness.

Finally, even if Jones's right to confrontation had been violated by the trial court's failure to strike Corniel's testimony, the error was harmless.  The Supreme Court has held that:

> the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to Chapman harmless-error analysis.  The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438.  As explained in the discussion on Jones's *Brady* claim above, the evidence against Jones was overwhelming even without Corniel's testimony; and, even if Corniel's testimony were necessary, the prosecution was able to thoroughly impeach him on the piece of evidence Jones's claims was most necessary for his conviction – that Jones said, "pop him."  Given that Corniel was already impeached on his most important testimony, and the jury already knew he had ample motive to lie, there would have been little additional "damaging potential" to cross-examination on which Corniel pleaded the Fifth.

Accordingly, even if Corniel's right to confrontation had been violated by failure to strike Corniel's testimony, the error was "harmless beyond a reasonable doubt."  *Id.*, 106 S. Ct. at 1438.

## CONCLUSION

For all of the reasons explained above, the Court recommends that the petition be DENIED.

## DEADLINE FOR OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Criminal Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Colleen McMahon, 500 Pearl Street, New York, New York 10007, and to Chambers of the undersigned, 500 Pearl Street, New York, New York 10007. **FAILURE TO FILE TIMELY OBJECTIONS WILL RESULT IN WAIVER OF OBJECTIONS AND PRECLUDE APPELLATE REVIEW.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: October 4, 2021
　　　 New York, New York

Copies transmitted this date to all counsel of record.